Wilson v Dave Constable Home Improvement Specialists (2004 NY Slip Op 50165(U))

[*1]

Wilson v Dave Constable Home Improvement Specialists

2004 NY Slip Op 50165(U)

Decided on March 19, 2004

Supreme Court, Oneida County

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on March 19, 2004

Supreme Court, Oneida County
 CATHLEEN M. WILSON and FRANK J. BASILE, 
 Trustee of the CATHLEEN M. WILSON IRREVOCABLE TRUST, Plaintiff
against
DAVE CONSTABLE HOME IMPROVEMENT SPECIALISTS, INC., and DAVE CONSTABLE, Defendants.
Index No. CA2003-001372

Brian Michael Miga, Esq. for the Plaintiffs.
C. Louis Abelove, Esq. for the Defendants.

Robert F. Julian, J.
DISCUSSION:
The Facts
This decision is rendered after a bench trial.
Plaintiff Cathy Wilson's husband was severely injured in 2002, resulting in a wheelchair confining paralysis that requires ongoing total care. While her husband was hospitalized with this injury, Mrs. Wilson consulted D. Victor Pellegrino, Esq., a Utica attorney who has a special interest in tax and estate planning. At the time of the injury, the Wilsons' assets were a home in Marcy, a retail flower business in Whitestown including a commercial structure, and cash in various investment vehicles. Mr. Pellegrino was retained by Mrs. Wilson and was ultimately paid between $7,500 and $10,000 by Mrs. Wilson for his services. Mr. Pellegrino recommended the creation of the Plaintiff' irrevocable trust which acquired ownership of the business property. Because the Wilsons' cash would be consumed by Mr. Wilson's medical and rehabilitative needs, the attorney advised Mrs. Wilson that prior to applying to Oneida County (the County) for government benefits including Medicaid, they should spend the $130,000 for the purpose of remodeling their home and business structures to accommodate Mr. Wilson's quadraparetic condition.
Mr. Pellegrino recommended his client, Dave Constable, the owner of Dave Constable Home Improvement Specialists, Inc., (Defendants) as a reputable contractor with experience in handicapped accessibility remodeling. Mr. Pellegrino arranged to have Mrs. Wilson meet Mr. Constable at his law office. After an initial meeting, Mrs. Wilson and Mr. Constable met again with Mr. Pellegrino with some frequency, and two contracts were prepared by the lawyer, one which set forth the terms and conditions for the remodeling of the home and one which set forth the terms and conditions for the remodeling of the business. Mr. Pellegrino advised both parties that each was his client and that he could only represent both sides if they were amicable. The attorney billed Mr. Constable for their conferences, but did not advise Mrs. Wilson of that fact. [*2]Mrs. Wilson paid Mr. Constable $130,000 after the contract was signed, and he deposited approximately $70,000 in the business account owned by his corporation and $60,000 was deposited in his personal checking account.
It is undisputed that the contracts failed to comply with the applicable requirements of the General Business Law. Mr. Pellegrino testified that the objective was to transfer the Wilsons' funds out of their possession irrevocably, thus the contracts did not contain provisions for the usual installment payments based upon construction milestones. The objective was to persuade the Oneida County Officials who were to receive the Wilson application for medicaid benefits that the money transferred to the Defendant Corporation and to Mr. Constable was not an available resource. Based on this plan, Mr. Pellegrino justified the absence of the protections required pursuant to §771 (e) (f) of the General Business Law, as well as those one might expect consistent with usual custom and practice in a comparable circumstance. The contracts were signed May 21, 2002 and provide for work to commence on June 1, 2002. Each contract requires completion of work by June 30, 2002. At the time of signing neither contract contained any details regarding the work to be performed or the materials to be provided. Both contracts declare that time is of the essence. Mr. Constable, Mrs. Wilson, and Mr. Pellegrino all acknowledge that while executing the contracts they agreed that the completion date in both contracts was unrealistic and could not be met. It was undisputed that Mr. Constable asked for and received verbal consent from the Plaintiff to extend the completion date for both projects.
Days after the contracts were signed a separate Schedule A, which contained a breakdown of some contract details including some of the materials to be provided, and costs, was provided by the Defendant to be attached to the contracts. The Plaintiff asserts that a Schedule B was also to be provided, which was to give a specific detailed breakdown of labor and materials. A Schedule B was never generated by the Defendant or Mr. Pellegrino. Schedule A as attached to both contracts does not provide the detail contemplated by GBL §771 1.(c).
 With regard to the house, Schedule A was updated and supplemented several times. Both contracts call for contract change orders to be signed by both parties, but none were. Neither contract requires a periodic accounting of work in progress including time and money expended therefore and materials and money expended thereon. The Plaintiff asserts that an engineer was to be hired as part of Schedule A. The Defendant disputes this contention and maintains that while an engineer may have been necessary to provide as built plans for town approval, this was an extra cost not contained within the original $60,000 contract price for the work to be performed at the business.
Before Defendants commenced work on the contracts, the parties entered into a third contract for work not encompassed within the aforementioned two contracts. The third contract provided for the construction of an addition to the residence. It is undisputed that approximately $29,000 of the $60,000 advanced by the Plaintiffs for the renovation of the business was diverted by mutual oral agreement of the parties to fund said addition.
The Defendant worked in the summer and early fall at the house and thereafter at the business until he ceased work there on January 10, 2003. As 2002 wound down the Defendant demanded more money from the Plaintiff through Mr. Pellegrino who in January wrote several letters to the Plaintiff seeking further payment on behalf of the Defendants. The attorney thereafter ceased to take the Plaintiffs' telephone calls reasoning that he would not deal unilaterally with either party.
It is undisputed that Defendants have been paid in full for the work that was to be performed at the house and that the house is presently incomplete. It is also undisputed that the work to be performed pursuant to contract at the business is presently incomplete. On or about [*3]January 10, 2003, Defendants left that job because Mrs. Wilson had not paid in full the $60,000 contractually agreed upon to remodel the business. Because of the unfinished present status of both projects, Mr. Wilson does not have access to the business and he has limited access to much of the house. It was estimated that upon completion of construction he would be able to access ninety percent of the house.
The Contracts
In order for the Court to determine the validity and applicability of the specific language of the contracts, it is essential to review the history of the drafting of the contract.
Mr. Pellegrino drew separate contracts for work to be performed on the Plaintiffs' house and business. The parties signed the contracts on May 21, 2002. All agree that the contracts when signed lacked any detail regarding the project or any specific methodology for incremental payments. Mr. Pellegrino told the Plaintiff that the contracts were not the ordinary escrow arrangement and that Mrs. Wilson could have them reviewed by another attorney. He did not advise her that it would be prudent to do so.
Mr. Pellegrino justifies these omissions by characterizing the contracts as devices to persuade the County that the $130,000 would not be an available resource when Mrs. Wilson would, in the near future, apply for government benefits for Mr. Wilson. The concern was that the County would seek some or all of this money pursuant to Medicaid law to mitigate its costs arising from Mr. Wilson's many expenses. Both contracts establish a completion date of June 30, 2002 and provide that time is of the essence. Mr. Pellegrino and the parties agree that they all knew that the Defendant could not actually meet the deadlines. In fact the actual work started on the house after the contract completion date, on or around July 10, 2002. Work did not start on the business property until the fall of 2002.
The contract for the remodeling work at the house provided for payment of $70,000 and the contract for the business provided for payment of $60,000 and the contracts also provided that both payments were irrevocable after June 12, 2002. No cogent explanation was given for this division of the money. Mr. Constable deposited one check in its business account and the other check in his personal account. By virtue of this act, the Court deems the corporate veil pierced, and the Defendant's motion to dismiss regarding his personal liability is denied. State of New York v. Robin Operating Corp. 2003 WL 23185993, 2004 N.Y. Slip Op. 00305 N.Y.A.D. 3 Dept.,2004:

 The doctrine of piercing the corporate veil is equitable in nature "and assumes that the corporation itself is liable for the obligation sought to be imposed" (Matter of Morris v. New York State Dept. of Taxation & Fin., 82 N.Y.2d 135, 141 [1993] ). Generally, a party seeking to pierce the corporate veil must show that "(1) the owners exercised complete domination of the corporation in respect to the transaction attacked; and (2) that such domination was used to commit a fraud or wrong against the plaintiff which resulted in plaintiff's injury"
Accord: Alpha Bytes Computer Corp. v. Slaton 307 A.D.2d 725, 762 N.Y.S.2d 328 [ 4 Dept. 2003].
Mr. Constable's distribution of the money demonstrated the common identity of his and the defendant corporations interests and existence. Plainly, at least in this case, the corporation was a mere instrumentality, a pocket to put things in if he chose. The Plaintiffs' statutory rights were disregarded in the process. Both parts of the test set forth in State v. Robin, supra, are met, the corporate/personal distinction is meaningless in this case, and Mr. Constable and the corporation are one for all purposes herein.
In an attempt to unravel who had a duty to whom in this matter, the Court asked Mr. Pellegrino to identify whom, in his opinion, he represented when drawing the contracts at issue, [*4]reminding him of the general principal that any ambiguity in the contracts would be construed against the drafter. He replied that he was representing Mrs. Wilson. Mr. Pellegrino and Mrs. Wilson did not have any written agreement setting forth the scope of his services. However, further examination revealed that while Mrs. Wilson had paid Mr. Pellegrino either $7,500 or up to $10,000, as previously mentioned, Mr. Pellegrino had billed the Defendant for the joint meetings with the Plaintiffs and Defendants at his office, including contract preparation. Mr. Pellegrino also had no written contract for his services with the Defendants , but it is obvious that with regard to the contracts at issue, he was acting on the Defendants' behalf. Moreover, Mr. Pellegrino in December 2002 and January 2003 acted to collect upon the contracts on behalf of the Defendant. The Plaintiff testified that until she received Mr. Pellegrino's letter on behalf of the Defendant, she thought Mr. Pellegrino represented her and that she was unaware that Mr. Pellegrino had billed the Defendants for the meetings and the contract. The Defendant Constable testified he was not sure who Mr. Pellegrino represented.
Based upon the following facts and factors the Court concludes that Mr. Pellegrino was representing the Defendants in drafting the two contracts at issue:
Both contracts call for the posting of a bond or an irrevocable letter of credit by the Defendant. This was not done but would have insisted upon by any attorney representing the Plaintiff before disbursing an irrevocable $130,000 up front payment. Moreover Mr. Pellegrino billed the Defendant for preparation of contracts and he attempted to collect upon the contracts for the Defendant. The contracts lacked any statutory or common safeguards for the Plaintiffs. This inescapably leads to the conclusion that Mr. Pellegrino was representing the Defendants in the drawing of these contracts, and, as a consequence, any ambiguity must be resolved against the Defendants. Jacobson v. Sassower (1985), 66 N.Y.2d 991. The various interactions of Schedule A that the Defendants proffered are unsigned, hopelessly confusing and impossible for this Court to resolve by any means of construction. The Court finds therefore that the many ambiguities which permeate the contracts are the result of the Defendants' failure to provide detail regarding extras and increased costs, and are consequent to the shared draftsmanship of the Defendants and their attorney. See 22 N.Y.Jur. §260.
ANALYSIS
A. DAMAGE THEORIES
The measure of damages for breach of contract by the contractor is the actual cost to finish the work which the contractor had agreed to do. Pierce v. Cornell, (1907) 117 A.D.2d 66, 102 NYS 102. See 36 NYJur2d §48. In an action by a contractor for labor and materials, a defendant contractee is entitled to a credit against the amount due for work not performed and for repairs necessary by reason of defective performance. Gem Drywall Corp v. C. Scialdo & Sons, Inc. (1973, 2nd Dept.) 42 A.D.2d 1045, 35 N.Y.2d 781.
In this case the Defendant Constable estimated that he had completed 75% of the business renovation, and that $35,000 would be required to finish that job. He estimated that $7,500 to $10,000 would be required to complete the home.
Defendants acknowledge that they were paid in full for the house renovation and addition. The Defendants have not proven by quantum meruit the value of the work on the house or the addition. Frank v. Feiss, 266 A.D.2d 825 (4th Dept., 1999). There is no direct evidence of the reasonable value of the work performed that cogently meets the standard of proof of a preponderance of the evidence. Unlike Frank, supra, the contract does not adequately provide indirect evidence because it is vague. Pursuant to Mindich Developers, Inc. v. Milstein, 227 A.D.2d 536 (1996) the Defendants cannot receive lost profits given their failure to comply with [*5]General Business Law §771. Thus, the Court concludes that the only proper measure of damages for the house and addition, given the acknowledgment by the Plaintiff of payment in full, is the cost of completion.
The so-called extras or exceeding of allowances with regard to the contracts for the improvements at the house, for the construction of the addition and for the alterations at the business are not sufficiently specific or persuasive to resolve any of these issues in favor of the Defendants. Moreover, because the change orders and extras were not written and signed by the parties in violation of the contract, issues regarding change orders as modifications of the contract or as extras increasing the cost of the job must be resolved against the Defendants.
Finally the Defendants have not proven the quantum meruit value of the work performed on the business. Frank v. Feiss, supra.
B. THE RESIDENCE
The objective of the renovations at the residence was to make all three floors of that structure wheelchair accessible, and included the installation of a lift to achieve accessibility. It is undisputed that there were delays in ordering the lift, but that it was available by December, 2002. The Defendants argue that the Plaintiffs impeded their ability to complete the residence by asking them not to work in the beginning of December because of the holiday season. The Plaintiffs deny this and maintain that they wanted the work completed as soon as possible as the house was only partially accessible to Mr. Wilson without the three level lift. The Defendants argue there were extras associated with the installation of the lift, including modification of the lowest floor of the house which required expansion of doorways and other unexpected work on the walls. The Court, having actually examined the area where the lift was to be installed, finds the so-called extras as not unexpected requirements to install the lift and make the area accessible. The area is narrow and requires obvious modification to structures in order to accommodate the wheelchair and install a lift. It is undisputed that approximately forty hours of finish work are required to complete the house.
The Defendants did not provide a persuasive reason for not completing the house, including the installation of the lift. Their failure to complete the project was a breach of the contract signed on May 21, 2002.
Utilizing the cost of completion measure of damages, the Court finds that the Defendant owes the Plaintiff $14,780 with regard to the house and addition, the same to cover all finish work, the cost of the lift and its installation and the cost of preparing the structure for the lift. Specifically, the Defendants are to pay $5,700 [Donohoe, page 125] for the lift, $6,200 for labor and materials to prepare for lift, including moving a staircase and doing work on a wall and $2,880 to complete the rest of the house.
C. THE BUSINESS
The Plaintiffs complain that the defendant installed internal stairs in an addition to the business that rendered said addition unuseable by Mr. Wilson. The Plaintiffs also complain that a handicapped ramp installed by the Defendants is unuseable, a carport is unfinished, and that floors and finish work inside the premises are either defective or not complete.
With regard to the business renovations, the Defendants estimate that $35,000 will be required to complete the project and that it was 75% completed as of January 10, 2003. The Defendants utilized funds to construct two handicapped accessibility ramps, one temporary and the present permanent ramp, which is floridly non-compliant with the regulatory requirements for such a structure. The Defendants argue that they were trying to install a ramp that would allow [*6]the van to park in the carport pursuant to the Plaintiffs' wishes even though they were aware that the ramp did not conform to codes. The Court, having observed the site, concludes that an engineer or architect was required to design a code compliant and useful ramp and car port. The Defendant unquestionably failed to obtain engineering or architectural assistance and failed to provide a code compliant, functional ramp.
The Plaintiffs also argue that the addition was constructed to allow Mr. Wilson to be present at the business and that stairs installed by the Defendant to give internal access to the basement rendered that objective impossible.
The dispute concerning the business premises must be resolved by a different measure of damages than utilized for the house because the Plaintiff and Defendant both agree that payment in full was not made for the business. Resolving ambiguities in the contract against the Defendant, the Court concludes that all work performed by the Defendant on the site was paid for, including but not limited to the floors, addition and handicap ramps, as well as the remodeling of the cooler, creation of the kitchen, and the remodeling of the bathroom.
The Defendants did not prove by a preponderance of the evidence that the work performed at the business was in excess of what had been paid up to the time they walked off the job on January 10, 2003. The Defendants must so prove in order to establish a claim for compensation on quantum meruit grounds. Precision Foundations v. Ives 2003 WL 23208362, 772 N.Y.S.2d 116
[3 Dept.,2004]. Therefore, the Defendants have a duty to replace the handicapped access ramp, and the Court finds the cost to do that to be $7,500.
The Court resolves the issue of the internal installation of the stairs in favor of the Plaintiff as well and finds that $5,600 is the fair cost to remove the internal stairs and install external access. Because the $29,000 paid to construct the addition to the house consumed much of the remainder of the money available for business remodeling, the completion of the car port and the installation of vinyl siding are prospective costs for which payment was demanded and not received. The Plaintiff acknowledges that after she received the January 7th letter from Mr. Pellegrino demanding that she pay the Defendants, she had $10,000 that was available to pay the Defendants for work which she opted to not pay over. This money was required to complete the car port, vinyl siding and to do other prospective work. The Court finds the Defendant was not obligated to complete that work without payment.
Given the aforementioned defects and failures in the project, the Court concludes that the best measure of damages for these items is the actual cost to finish the work that the Defendants substantially completed but was defective. The Court therefore finds that the following are the costs to complete the areas where work was performed by the Defendants in an unsatisfactory manner and for which the Defendants must pay the Plaintiffs:
$3,200 to complete all flooring;
$5,600 to remove stairs in office and to install exterior stairs;
$7,500 to install a codes compliant ramp;
$ 30 for cabinet
$ 100 water stain on ceiling.
The Court does not make an award to Plaintiffs for the completion of the carport and siding or any of the other business related claims not specified above.
D. ALLOWANCES AND EXTRAS
With regard to both the house, the addition and the business, the Defendant testified that there were allowances and extras for certain items and the Plaintiff exceeded those allowances [*7]and/or acquired extras not contemplated by the job. The Defendant seeks a credit for these expenses. Since the Defendant's lawyer drew the contract and the Court finds the contract to be ambiguous, under the law it is to be construed against the Defendants. 67 Wall Street Company v. Franklin National Bank, 37 N.Y.2d 245 (1975). Therefore Defendants are not given credit for these. A cogent complete accounting of labor and materials installed at each site was not proven nor were change orders properly signed pursuant to the contract for either changes or extras.
E. ATTORNEYS' FEES
The Plaintiff requests attorneys' fees pursuant to §772(1) of the General Business Law. False or fraudulent written representation or false written statements are the sole statutory bases for this relief and the same have not been proved in this case. The application for attorneys' fees is denied.
F. VIOLATION OF THE GENERAL BUSINESS LAW
The Plaintiffs request that the Court impose fines upon Defendants pursuant to the General Business Law. The Court imposes a fine of $100 per contract, or a total of $300, for technical violations of §771(1) of the General Business Law. The Court does not have discretion under the statute in regard to technical violations. The Court may also impose fines for substantial violations of the statute. However, §773(3) of the General Business Law permits the Court to find and apply mitigating factors regarding the imposition of civil penalties for substantial violations. This appears to be a case of first impression on the issue of mitigation where there are both technical and substantial violations. The Plaintiffs agreed to a contract that violated this Section of the law essentially to avoid having the County seek their assets to offset Medicaid costs. Compliance with §777(1) of the General Business Law was directly contrary to the main objective of these contracts, which was to divest the Plaintiffs of any right to the monies. While Plaintiffs would have been better served if represented by counsel, the overall circumstances of this case make an imposition of fines on the Defendants unfair as they were not advised by their attorney of their risks under the law, were unaware of the law, and were servicing a contract that was, by the Plaintiffs' stated purpose, in violation of this law. Therefore no civil penalties are levied against the Defendants for their substantial violation of the aforementioned General Business Law because of the mitigating factors mentioned above.
Accordingly, judgment shall enter for the Plaintiffs against the Defendants (jointly and severally, in the amounts of $14,780 for required work to the home and $16,430 to the business, for a total judgment in favor of the Plaintiffs in the amount of $31,210.
Plaintiff shall submit judgment on notice to Defendants.
Dated:
Utica, New York
Robert F. Julian, J.S.C.
Decision Date: March 19, 2004